IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRITTANY WALDRON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-4289 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| TARGET CORPORATION d/b/a | ) | |
| TARGET STORES or SUPER TARGET, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Brittany Waldron ("Plaintiff") brings suit against Defendant Target Corporation d/b/a Target Stores or Super Target ("Defendant" or "Target") for general negligence (Count I) and negligence – premises liability (Count II).[1] Currently before the Court is Defendant's motion for summary judgment [48]. For the following reasons, the motion [48] is granted. As the motion resolves all claims between all parties, a final judgment will enter consistent with Federal Rule of Civil Procedure 58 in favor of Defendant and against Plaintiff and this civil case will be terminated.

**I.  Background**

The following facts are taken from the parties' Local Rule 56.1 statements and supporting exhibits, see [49], [54], [59], and are undisputed except where a dispute is noted. Plaintiff is a resident and citizen of Illinois. Defendant is a Minnesota corporation with its principal place of business in Minnesota. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue is proper in this district because a substantial part of the

---

[1] See [1] at 4 *et seq*. Defendant Katie Larson, a Target manager, was dismissed from this lawsuit in 2019. See [21], [27].

acts or omissions giving rise to the lawsuit occurred in Yorkville, Kendall County, Illinois, which is located in this district.

This lawsuit concerns a slip-and-fall accident that occurred on October 7, 2017 in a Target store located at 1652 North Beecher Road in Yorkville, Illinois ("Store"). Prior to that date, Plaintiff had shopped in the store an average of one to two times per month and always found it to be clean and well-maintained. The accident occurred on a Saturday night, when the store was not very crowded. See [54] at 3. Plaintiff was at the Store with her fiancé, Nicholis Frantz ("Frantz"), and their three children, purchasing breakfast items for the next morning. The weather had been rainy most of the day. Plaintiff recalled that it was raining as they walked into the store while Frantz could not recall whether or not it was still raining. When they entered the store, either Plaintiff or Frantz obtained a "kiddy cart" type of shopping cart, which had two seats for young children to sit in, and placed their two younger children in the seats; neither of them recalled whether they got the cart from outside or inside of the store.

Upon entering the store, the family turned right and walked all the way to the display along the north wall of the store. They then turned left (west) and walked all the way to the back corner, which would have been the northwest corner, of the store. Plaintiff recalls that when they reached the northwest corner of the store, she turned left (south), picked up some milk and eggs, and then the family reversed course, going back in the direction from which they had come. See [54] at 4-5. By Plaintiff's recollection, after they reversed course, they turned right into the main aisle along the north wall, walked past the first end cap, which was to their right, and then Plaintiff slipped and fell. The location of Plaintiff's accident was in the main aisle in the grocery section with cooler doors and end-of-aisle "caps" that contain frozen meat and other food. While it was not crowded at the time, this aisle is often heavily trafficked by customers. See [59] at 1-2. The end

2

cap near which Plaintiff fell was located in close proximity to the doors that Store employees use to enter and exit an employee back room.

Frantz's recollection was essentially the same as Plaintiff's. Frantz testified that Plaintiff fell closest to the second-to-last aisle if one is headed west along the north wall. She fell in the aisle on the north wall. See [54] at 5. The photograph attached to Defendant's Rule 56.1 Statement as Exhibit D was taken by Plaintiff and shows the northwest corner of the store, where Plaintiff was walking immediately before she turned right and fell. See [49-4] at 2. The photograph marked Exhibit E was taken by Plaintiff and shows the end cap near which Plaintiff fell—the end cap shown furthest away from the vantage point of the photographer. See *id*. at 4.

Plaintiff slipped and fell on a clear liquid on the floor. Her clothes were wet. Neither Plaintiff nor Frantz saw the liquid before Plaintiff slipped and fell. Frantz did not know the size of the spill. Plaintiff testified that the spill "wasn't very large." [54] at 6. She described it as a "small pool," which one "may have seen" if "walking staring at the floor." [49-1] at 22-23; see also [54] at 6. Neither Plaintiff nor Frantz knew how the liquid came to be on the floor or knew how long it had been on the floor prior to Plaintiff's accident. Neither saw anything dripping from anywhere in the Store on the night of the accident. Neither saw any footprints or marks from the wheels of a shopping cart going to or from the area where Plaintiff slipped and fell. Neither saw any Target employees in that area of the Store before Plaintiff's accident. See *id*. at 7. Before her accident, Plaintiff saw two other customers in a "side aisle" adjacent to the end cap where she slipped and fell; she does not know whether or not those customers had been in the area of her fall before she fell. See *id*. at 10.

Target employee Tanya Gamble ("Gamble") was the Store's Leader on Duty ("LOD") on the night of the accident, which means that she was the Store employee responsible for checking

3

in with employees in all departments and making sure the evening's closing tasks were being completed. Gamble was also responsible to respond to any incidents in the store. When she heard Target employee Matt Sternberg ("Sternberg") call "code green" on the store's walkie-talkie system indicating there was a guest or employee injury in the grocery department, she responded to investigate Plaintiff's accident. When Gamble arrived, Plaintiff was still on the floor and in pain. Plaintiff told Gamble that she slipped on water. Gamble suggested water had come from the cart, but Plaintiff disagreed. Plaintiff also told Gamble that she had been walking in front of the cart. See [59] at 3.

Gamble prepared three reports on the night of the accident. The first was a "Guest Incident Report," which Plaintiff signed but relied on Gamble to fill out. See [59] at 3. At this time, "[i]t was late, [Plaintiff's] arm hurt, and she wanted to leave." *Id*. When Plaintiff signed the Guest Incident Report, she "missed seeing a single line written by Gamble that indicated that water was on the floor from a cart." *Id*. "Gamble testified she does not recall why she wrote that line." *Id*. By the time of her deposition, she had "only a faint memory, and not much independent memory, of the incident." *Id*. Plaintiff did not see any water coming from the cart at any time when the family was in the store. She also testified that she "would not have placed her children in a soaking wet cart." *Id*. Frantz testified that he never saw any water on, trailing, or coming from the cart, and did not believe that the cart created the liquid pool. *Id*. No Target employee testified that they saw any water coming from a cart, either. According to Target employee Alexander Roller, cart attendants would sometimes dry wet carts. See [54-6] at 34-35. Sternberg testified that if he had seen water coming from the cart, he would have written it in his report (which is described below). After Plaintiff noticed "the incorrect line written by Gamble," Plaintiff "returned to the store within

4

a week to ask Target to amend the report." [59] at 4. Target allowed her to amend the report to indicate that the source of the water was "unknown." *Id*.

The second report that Gamble prepared on the night of the accident was an "LOD Investigation Report" documenting her investigation. According to that report, Gamble determined that Sternberg had been in the area of the fall within 30 minutes prior to Plaintiff's accident. See [56] at 8. The third report was a three-page "Electronic Incident Report," which states that Plaintiff slipped on "Liquid/Water" on the floor but is silent as to the origin of the water. See [59] at 24. The report indicates that Gamble cleaned the area after the fall and placed cones. *Id*.

Target employee Sternberg also prepared a report on the night of the fall, titled "Team Member Witness Statement." [59] at 24. His report stated that he was the first to respond to the accident and that he found Plaintiff's clothes wet from small amounts of water on the floor. Sternberg indicated that the water was cleaned up by the "LOD," who was Gamble.

The Store has a video security system, which was active on the night of the incident. The camera closest to the location of the accident did not capture the exact area where Plaintiff fell, but captured nearby areas. Defendant produced the video footage as Exhibit H to its Local Rule 56.1 statement.[2] At about 7:40 p.m.,[3] the video shows an individual who Gamble identified as

---

[2] Plaintiff testified that after she fell, she saw what she believed to be "multiple cameras" and that one of them was, in her attorney's words, "over" her and closer to the area where she fell than the video produced by Defendant in discovery. [59] at 17. However, the summary judgment record contains no evidence that there is or was any other video of the accident. The Store's asset protection team leader, Gary Andres, testified that the Store had a number of "black bubbles" in the ceiling that contained video cameras, but there were also "dummy bubbles" that did not contain cameras. See *id*. At his deposition, Andres described how he reviewed the video feeds of various cameras but determined that there was no camera in the Store that captured footage of Plaintiff falling; the video produced by Defendant was the closest to the area where Plaintiff fell. See *id*. at 17-18. At her deposition, Plaintiff acknowledged that she was aware of the concept of a "dummy" or "fake" camera and that she has no knowledge as to which of the bubbles in the Store contained working cameras and which contained dummy cameras. See [49-1] at 31.
[3] The times noted are shown on the time stamp in the upper left-hand corner of the video.

5

Target employee Gary Andres standing toward the north end of the liquor aisle (the fourth aisle from the west end of the Store) looking into the main grocery aisle where Plaintiff later fell; he then appears to browse in the liquor aisle until about 7:45 p.m., when he meets up with a woman in a cart and they walk eastward along the main grocery aisle and out of camera view. Defendant denies that the person shown in the video is Andres. See [59] at 15-16. At about 7:41 p.m., the video shows an individual who Gamble identified as Sternberg slowly making his way eastward along the north wall of the store, moving off camera at around 7:44. See *id.* at 19. At about 8:05 p.m., the individual is seen making his way westward along the north wall of the store, stopping approximately four endcaps to the east of where Plaintiff fell, and then turning around and going back the direction he came from. See *id.*; see also [96-3] at 1 (Plaintiff's mark-up of floor plan produced by Defendant).

    The summary judgment record also contains photos taken in the Store. Within a week of the fall, Plaintiff returned to the Store to photograph it. The photos are attached as Exhibit I to Plaintiff's Local Rule 56.1 statement. See [54-7] at 2-7. Photographs 1, 2, and 4 show a westerly view of the main grocery aisle and two end caps (farthest from the camera) on the left where Plaintiff fell. Photo 3 shows a northerly view of the back-room doors in the aisle farthest to the west. The perpendicular aisle in the upper right of the photo is the main grocery aisle between the back room doors and end caps, around the corner to the right, where Plaintiff fell. Photo 5 shows a black stain on the ceiling. Plaintiff claims that the stain is "directly above" the end cap where she fell, while Defendant disputes this, relying on Photos 1 and 2 and testimony from Gamble. See [59] at 21. About a year after the fall, Gamble also took photos of the area in which Plaintiff fell; those photos are also part of Plaintiff's Exhibit I, photos 9 and 10. See [54-7] at 10-11.

6

Gamble testified that she photographed the dark mark because she was "asked to," but did not know what the mark was. [59] at 21.

In addition, the summary judgment record includes a spreadsheet log of work orders, which "states that the store experienced roof leaks in the back room since 2016." [59] at 22. The back room is located behind a wall to the north of the main grocery aisle where Plaintiff fell. See *id*.; see also [96-3] at 1.

Target employees are trained to be observant, as they work throughout the store, for items or substances on the floors that could pose a danger to employees or customers. If they come across something on the floor that could cause someone to slip, they are trained to call for assistance on their walkie-talkies and "guard the spill," which means to stay with it and not leave it unattended until another employee is able to come to their assistance to clean it up. [54] at 8. There is no set schedule or timetable for employees to inspect the floors; rather, being observant for potential hazards was something employees were supposed to do at all times while working. *Id*.; see also [59] at 7. Employees are trained to walk departments and adjacent areas to be on the lookout for cleanliness and neatness of the store. The tasks assigned to Target store employees may vary from day to day, hour to hour, or even minute to minute, and while attending to those tasks, employees are also supposed to be observant for any condition that could cause a hazard, and in the event that they become aware of such a condition, they are to address it. See *id*. at 7-12. Target employee Andrea Kleinschmidt, who was the executive team lead of Human Resources for Target at the time of the incident, see [54-5] at 15, agreed with Plaintiff's counsel that if an employee walking down an aisle "saw a clear pool of liquid or some kind of liquid on the floor," that "would be the type of thing that could cause someone to fall that you would identify and fix." *Id*. at 71.

7

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). It "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252. "'If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Doxtator v. O'Brien*, 30 F.4th 852, 860 (7th Cir. 2022) (quoting *Liberty Lobby*, 477 U.S. at 249–50).

**III.    Analysis**

The governing complaint [1] contains two counts. In Count I, for general negligence, Plaintiff alleges that Defendant breached its duty to exercise ordinary and due care in the operation, maintenance, management, and control of its Store for the safety of its patrons by: (a) causing the pool of water to exist; (b) failing to have a reasonable inspection schedule in place; (c) failing to have reasonable safety protocol for cleaning and maintaining its floors; (d) failing to remove debris from an aisle; (e) failing to warn Plaintiff about the water; and (f) failing to properly train, monitor, or supervise its employees. See [1] at 4-7. In Count II, for "negligence – premises liability," Plaintiff alleges that she was injured as a direct result of Defendant's careless and negligent failure to protect her from an unreasonable risk of harm, and in particular Defendant's failure to make a reasonable inspection of the floor, clean the floor, warn patrons, train, monitor and supervise employees, or follow safety protocols regarding the cleaning and maintenance of floors. See *id.* at 7-10.[4]

Defendant moves for summary judgment on both counts. Illinois law governs in this diversity case. See *Piotrowski v. Menard, Inc.*, 842 F.3d 1035, 1038 (7th Cir. 2016). In an action

---

[4] Count III, a negligence claim against Target employee Katie Larson, see [1] at 10, was dismissed in 2019 by agreement of the parties. See [27].

9

alleging negligence, the plaintiff must show "a duty owed by the defendant, a breach of that duty, and injury that was proximately caused by the breach." *Id*. (citing *Newsom–Bogan v. Wendy's Old Fashioned Hamburgers of N.Y., Inc*., 953 N.E.2d 427, 431 (Ill. App. 2011)). As to the duty element, Illinois "businesses owe their invitees a duty to maintain the premises in a reasonably safe condition to avoid injuring them." *Zuppardi v. Wal-Mart Stores, Inc*., 770 F.3d 644, 649 (7th Cir. 2014) (citing *Marshall v. Burger King Corp.,* 856 N.E.2d 1048, 1057–58 (Ill. 2006); *Thompson v. Economy Super Marts, Inc.,* 581 N.E.2d 885, 888 (Ill. 1991); *Reid v. Kohl's Dept. Stores, Inc.,* 545 F.3d 479, 481 (7th Cir. 2008); *Peterson v. Wal–Mart Stores, Inc.,* 241 F.3d 603, 604 (7th Cir. 2001)).

The general rule in Illinois (subject to exceptions that are not at issue here) is that "business operators are not liable for injuries resulting from the natural accumulation of ice, snow, or water that is tracked inside the premises from the outside." *Reed v. Galaxy Holdings, Inc*., 914 N.E.2d 632, 636 (Ill. App. 2009) (citing *Branson v. R & L Investment, Inc*., 554 N.E.2d 624, 628 (Ill. App. 1990)). Under this "natural accumulation" rule, "property owners and business operators do not have a duty to remove the tracks or residue left inside the building by customers who have walked through natural accumulations outside the building" and "[i]t is irrelevant whether a natural accumulation remains on the property for an 'unreasonable' length of time." *Id*. Thus, the parties are in apparent agreement that if a jury were to conclude that Plaintiff slipped in rainwater that was tracked in from outside or that dripped from a shopping cart, Defendant would not be liable for negligence.

However, "[l]iability can be imposed when a business's invitee is injured by slipping on a foreign substance on its premises if the invitee establishes that (1) the substance was placed there by the negligence of the business; (2) the business had actual notice of the substance; or (3) the

10

substance was there a sufficient length of time so that, in the exercise of ordinary care, its presence should have been discovered, *i.e.*, the business had constructive notice of the substance." *Zuppardi*, 770 F.3d at 649 (citing *Newsom–Bogan,* 953 N.E.2d at 431; *Pavlik v. Wal–Mart Stores, Inc.,* 753 N.E.2d 1007, 1010 (Ill. App. 2001)). Plaintiff advances the first and third bases for liability in opposition to summary judgment.

### A. Negligent Placement

"In order to create a triable issue of fact with respect to placement of the substance" by the negligence of a business, the plaintiff must "present some evidence showing that the substance was more likely placed on the premises through [the business's] own negligence rather than a customer's." *Zuppardi*, 770 F.3d at 649 (citing *Donoho v. O'Connell's, Inc.*, 148 N.E.2d 434, 441 (Ill. Sup. 1958)); see also *Osmani v. Menard, Inc.*, 2017 WL 2985742, at *3 (N.D. Ill. July 13, 2017); *Reed v. Wal-Mart Stores, Inc.,* 700 N.E.2d 212, 214 (Ill. App. 1998). "To prove that the defendant business, as opposed to a third person, created the dangerous condition, Illinois courts have required the plaintiff to (1) show that the foreign substance was related to the defendant's business and (2) 'offer[ ] some further evidence, direct or circumstantial, however slight, such as the location of the substance or the business practices of the defendant, from which it could be inferred that it was more likely that defendant or his servants, rather than a customer, dropped the substance on the premises[.]'" *Zuppardi*, 770 F.3d at 649-50 (quoting *Donoho,* 148 N.E.2d at 439).

Plaintiff's "placement" theory is that she slipped on water that was on the floor as a result of Defendant's negligence in maintaining its roof. Plaintiff's evidence consists of photos of the dark stain on the Store ceiling; Plaintiff's testimony that the stain was located directly above where

11

she fell; and work orders indicating that three months before the accident, there were leaks in the roof of the break room, which is located to the north of the main grocery aisle where Plaintiff fell.

The Court agrees with Defendant that Plaintiff is not entitled to go to a jury on her placement theory. Simply put, the summary judgment record contains insufficient evidence from which a trier of fact could infer that it was more likely than not that the pool of water in which Plaintiff fell was caused by a leak in the Store's roof, rather than some other source not attributable to the store, such as a customer spilling the water or tracking in rainwater from outside.

The work order to which Plaintiff points is for the break room to the north of where Plaintiff fell and gives no indication that the Store had been experiencing any leaks in the main grocery aisle, either at that time or three months later when Plaintiff fell. The dark stain on the ceiling comes closer to supporting Plaintiff's leak theory, serving as circumstantial evidence that there was a leak in the ceiling in that area at some point before the photos were taken. But the evidence supporting the leak theory is "not significantly probative," *Doxtator*, 30 F.4th 860, because there is no other evidence in the record suggesting that water was leaking from that spot on the night Plaintiff fell. Plaintiff and Frantz did not see anything dripping from anywhere in the Store on the night of the accident, [54] at 7, and Plaintiff had always found the store to be clean and well maintained on her prior visits, *id*. at 3. There is no evidence that any other customers or employees saw, tracked through, or reported a leak that day or evening. Instead, Sternberg, who had been working in the area the whole afternoon, testified that there was no leaking in the area or dripping from the ceiling. See [102] at 29.

Despite the weakness of this record, Plaintiff might have enough to take the question to a jury *if* the record supported Plaintiff's statement that the stain was directly above where she fell. But the pictures on which she relies undermine her testimony. Plaintiff fell in a "small pool" of

water in the main aisle along the north wall, after she turned into the aisle and walked past the first end cap. The spot on the ceiling was not above the main north aisle; it was to the south, above a large cooler of frozen food. The pictures that Plaintiff took show this, especially the bottom left image on page 5 of Plaintiff's supplemental brief. See [96-1] at 5. Plaintiff's counsel also acknowledged this at oral argument, stating that "I think we can agree that [the spot in the ceiling] is generally above this freezer, and where Ms. Waldron fell was just on the floor area outside of it." [102] at 35.

Plaintiff has not come forward with any evidence suggesting how a leak from the spot above the cooler could have caused a "small pool" of water in the main aisle. At oral argument, Plaintiff's counsel posited that "with the HVAC systems in these big box stores, there is a reasonable dispersion rate that this water could drop, and it could land directly on the floor where Ms. Waldron fell." [102] at 36. But this is speculative and not supported by any evidence in the record. Plaintiff does not elaborate on any facts necessary to support a reasonable inference that Defendant's HVAC system could, in fact, blow dripping water from the spot on the ceiling to the spot where Plaintiff fell. For instance, Plaintiff does not claim there are any vents nearby, or that they blow air in a particular direction. There are no reports of splattering water, or that water fell on the cooler and then somehow dripped down or leaked out from underneath the cooler. It is not even apparent whether a "dispersion rate" is a real concept or a term invented by Plaintiff's counsel at oral argument. In short, Plaintiff has not come forward with sufficient evidence on which the jury could reasonably find for her on the "leaking ceiling" theory of liability. See, e.g., *Osmani*, 2017 WL 2985742, at *3 (Menard's was entitled to summary judgment on plaintiff's claim that she slipped and fell on soil mixture that Menard's, rather than a third party, placed on the ground, where plaintiff relied on evidence that Menard's used the mixture in potted plants and trees that it

13

placed on pallets and watered daily, where plaintiff did "not elaborate on the facts needed to infer that Menards was the likely cause of the condition such as: whether trees were in fact watered or moved to or from the pallets on that day, how often trees are sold and/or moved, or whether the moving or watering of trees generally causes their soil mixture to spill onto the ground").

Under these facts, Defendant is entitled to summary judgment on Plaintiff's theory that she slipped in water that leaked from the ceiling due to Defendant's negligence. There is no evidence that the stain in the ceiling was dripping on the night Plaintiff fell; the stain is not directly above where she fell in the aisle, but rather is above the cooler; and there is no evidence supporting a theory that water dripping from the spot could have ended up in a small pool in the main grocery aisle.[5]

### B. Constructive Notice

Plaintiff may establish that Defendant had constructive notice of the pool of water by presenting evidence that either "(1) the dangerous condition existed for a sufficient amount of time so that it would have been discovered by the exercise of ordinary care; or (2) the dangerous condition was part of a pattern of conduct or a recurring incident." *Zuppardi*, 770 F.3d at 651. In opposition to summary judgment, Plaintiff pursues the first theory of liability based on constructive notice.

"Where constructive knowledge is claimed, '[o]f critical importance is whether the substance that caused the accident was there a length of time so that in the exercise of ordinary care its presence should have been discovered.'" *Zuppardi*, 770 F.3d at 651 (quoting *Torrez v. TGI Friday's, Inc.*, 509 F.3d 808, 811 (7th Cir. 2007)). In making this determination, "Illinois

---

[5] Given this resolution, the Court finds it unnecessary to consider whether rainwater leaking through a ceiling is properly considered a "foreign substance … related to the defendant's business." *Zuppardi*, 770 F.3d at 649-50 (quoting *Donoho*, 148 N.E.2d at 439).

courts use a case-by-case approach that examines both the length of time the spill existed, and the surrounding 'circumstances.'" *Osmani*, 2017 WL 2985742, at *4 (quoting *Reid*, 545 F.3d at 483). "Relevant circumstances include the area where the spill occurred, the time the spill occurred, the visibility of the spill, and the store's policies on patrolling its aisles for spills." *Id*. While "there is no bright line rule indicating the requisite time to establish notice, … periods in excess of ten minutes have failed the test." *Reid*, 545 F.3d at 483. "*Absent any evidence demonstrating the length of time that the substance was on the floor, a plaintiff cannot establish constructive notice.*" *Id*. at 482 (emphasis added); see also *Zuppardi*, 770 F.3d at 651; *Osmani*, 2017 WL 2985742, at *4; *Geleta v. Meijer, Inc*., 2013 WL 6797111, at *4–5 (N.D. Ill. Dec. 23, 2013); *Tafoya-Cruz v. Temperance Beer Co.*, 2020 WL 4436635, at *8 (Ill. App. July 29, 2020).

Plaintiff's "constructive notice" theory is that Defendant's "employees should have discovered the liquid pool had they exercised reasonable care." [55] at 5. Plaintiff relies on the surveillance video and screen shots to show that "employees were in this same area numerous times before Waldron fell." *Id*. In particular, the video shows that Sternberg was in the vicinity at 7:41 and 8:07 p.m., while Andres was in the area at 7:44 p.m.; Waldron fell around 8:12 p.m.[6]

Even if the Court assumes that these employees should have seen the water when they were in the area 5, 28, or 31 minutes before Plaintiff fell, it is speculation that the liquid was on the floor at any of those times. Target's surveillance video does not show the immediate area in which Plaintiff fell; rather, it is focused on the liquor aisle several aisles over. Although in some cases evidence could indicate that a spill had been around a while before the plaintiff slipped in it—for instance when the foreign substance has been tracked around by customers—any relevant circumstantial evidence in this case points to the water having been in the aisle for a short period

---

[6] As noted above, Defendant disputes the identity of the individuals shown in the video. The Court finds it unnecessary to delve into this dispute in order to decide the motion for summary judgment.

15

of time before Plaintiff slipped in it. The water was in a "small pool" and not tracked around; no customers had reported seeing it; Plaintiff and her fiancé had walked by just minutes earlier and did not see it or step in it; and no Target employees testified to have seen it. Compare *Zuppardi*, 770 F.3d at 651 (explaining that "all evidence in this case leads to the conclusion that the puddle [in which plaintiff slipped] was present for a very short period of time," where (1) plaintiff "testified that she did not know where the water came from"; (2) "[d]espite the puddle being located at the end of an 'action alley' heavily trafficked by both customers and employees, there were no track marks or footprints around the puddle"; and (3) "[t]he puddle was located near doors that lead to the back area of the store that were frequently utilized by employees"), *with Geleta v. Meijer, Inc.*, 2013 WL 6797111, at *5 (N.D. Ill. Dec. 23, 2013) ("[t]he evidence adduced supports an inference" that a chocolate-like foreign substance had been "on the bakery floor for some time and that it should have been noticed and remedied by at least one employee who had an ongoing duty to inspect and clean the floor," where, among other facts, "a Meijer employee confirmed that he had to mop a four-to-five-foot radius because the substance appeared either to have been run over by shopping carts or stepped on and smeared around").

Plaintiff compares this case to *Minnick v. Sam's West, Inc.*, 2018 WL 6101025 (N.D. Ill. Nov. 21, 2018), in which a plaintiff tripped over a large container of detergent that was sitting on the floor in front of display racks at a Sam's Club. See *id.* at *1. The summary judgment record contained video showing the container of detergent sitting in the aisle and the plaintiff tripping over it and falling. In a footnote supporting its conclusion that "a reasonable jury could find" that Walmart was negligent "in failing to protect shoppers against the condition," the court pointed out that "the video appears to show several Sam's Club employees walking by the container on the floor—before Minnick tripped over it—without taking any action to remove it or otherwise render

16

the condition safe." *Id*. at 2 n.1. Unlike in *Minnick*, there is no evidence in this case that the water was on the floor when Sternberg or Andres were nearby and allegedly should have discovered it. Under the facts of this case, it would be speculative to conclude that it was more likely than not that the water was on the floor when Sternberg and/or Andres passed by or, in turn, that they should have discovered it if they had been exercising reasonable care. See *Austin v. Walgreen Co*., 885 F.3d 1085, 1089 (7th Cir. 2018) (granting summary judgment to defendant on plaintiff's slip-and-fall negligence claim against store where plaintiff "relies on nothing but speculation to suggest that the alleged hazard existed for any significant length of time before her fall"). Therefore, Defendant is entitled to summary judgment on Plaintiff's "constructive notice" theory of liability as well.

**IV.** **Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment [48] is granted. As the motion resolves all claims between all parties, a final judgment will enter consistent with Federal Rule of Civil Procedure 58 in favor of Defendant and against Plaintiff and this civil case will be terminated.

Dated: August 19, 2022

_____
Robert M. Dow, Jr.
United States District Judge